UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 7 |
| | ) | |
| MICHAEL MODIRI, | ) | Case No. 06-12421 (REG) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| 1342 RESTAURANT GROUP, INC., | ) | |
| | ) | Adversary Proceeding |
| Plaintiff, | ) | No. 07-01005 (REG) |
| | ) | |
| *against* | ) | |
| | ) | |
| MICHAEL MODIRI, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

DECISION AFTER TRIAL

APPEARANCES:

BUDOW AND NOBLE, P.C.
*Attorneys for Plaintiff 1342 Restaurant Group*
7315 Wisconsin Avenue
Bethesda, MD 20814
By:     Richard E. Schimel, Esq. (argued)

ANTHONY BALSAMO, ATTORNEY AT LAW
*Attorney for Defendant Debtor*
40 Exchange Place
New York, NY 10005
By:     Anthony Balsamo, Esq. (argued)

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE

In this adversary proceeding under the umbrella of the Chapter 7 bankruptcy case of Michael Modiri (the "**Debtor**" or "**Modiri**"), plaintiff 1342 Restaurant Group, Inc. ("**Restaurant Group**") a corporation owned by Benson J. Fischer ("**Fischer**") and his wife, seeks a judgment, under Sections 523(a)(6) and 523(a)(2)(A) of the Bankruptcy Code, declaring that a debt resulting from a judgment for breach of a lease (or more precisely, a sub-sublease) in favor of Restaurant Group and against Modiri in the Superior Court of the District of Columbia is nondischargeable.   After a trial, in which the Court found much of the testimony of both Modiri and Fischer not to be credible and to be materially incomplete,[1] the Court determines that Restaurant Group has failed to establish nondischargeability under either ground, and judgment will be entered ruling that the debt is dischargeable.

The Court's Findings of Fact and Conclusions of Law in connection with this determination follow.

<u>Findings of Fact</u>

Modiri is an individual now residing in New York with his girlfriend and former business partner Hyang C. Yi ("**Yi**").[2]  Restaurant Group is a corporation owned and operated by Fischer in the District of Columbia.

---

[1]     For that reason, testimony this Court heard that it disbelieved, that amounted to half-truths; or that otherwise provides an insufficient basis for factual findings is preceded by words like "testified that," "claimed," or "asserted."  Facts actually found are stated in unqualified terms.

[2]     Though spelled with the letter "Y," Yi's name was typically pronounced as if it began with an "L," and documents and transcripts often reflected a phonetic spelling, such as "Lee" or "Li."  She submitted a direct testimony affidavit, but her cross-examination was waived.

Fischer, addressed as "Bennie,"[3] is or was in the real estate brokerage business,
though the record does not reflect whether or not he is or was licensed.  Fischer
established Restaurant Group in 1993, and by sublease described below, leased a three-
story building with a basement at 1342 G Street N.W., in Washington DC (the "**G Street
Property**").  After doing so, Fischer opened a restaurant known as Bensoni's on the first
floor and basement, and established his real estate brokerage office on the second and
third floors.  Thereafter, Restaurant Group closed the businesses in the building, and then
subleased out the space on all three floors.  It subleased the first floor and basement to an
entity known as Katie's Kitchen, and eventually subleased the third, and later the second
and third, floors to Modiri.[4]

The debt in question is a judgment, in the amount of approximately $500,000,
secured after a bench trial in the DC Superior Court (and later affirmed on appeal), for
damages for breach of contract (though not fraud).[5]  The judgment resulted from the
breach of a nonmonetary covenant in a sub-sublease agreement between Restaurant
Group and Modiri (the "**Sub-sublease**").  The covenant provided:

> Compliance with Legal and Insurance
> Requirements  The Subtenant, in the use and
> occupancy of the Premises, shall comply with all
> rules, regulations, laws, ordinances, statutes, codes,
> recommendations, and requirements of
> governmental authorities (including local Health
> Departments, the Environmental Protection Agency
> and the District of Columbia Department of the
> Environment) casualty insurance carriers insuring
> the premises and the Fire Insurance Rating
> Organization and Board of Fire Insurance

---

[3]     *See*. *e.g.*, Def. Exh. D.

[4]     Fischer Aff. ¶¶ 3-7.

[5]     *See Modiri v. 1342 Restaurant Group, Inc*., 904 A.2d 391, 393 (D.C. 2006) ("***Modiri-Appellate")***
("This case arises from breach of a lease of real property . . .").

> Underwriters having jurisdiction over the Premises
> as now in effect or promulgated in the future, and
> whether foreseen or unforeseen or ordinary or
> extraordinary.[6]

Restaurant Group brought its action against Modiri after Restaurant Group lost its

sublease upon a determination of a breach of the prime lease resulting from prostitution

in the G Street Property, discussed below.

*1. The G Street Property Lease and Subleases*

Minna Carry and several co-owners ("**Original Owners**") originally leased the

G Street Property to Creative Hairdressers, Inc. ("**Creative Hairdressers**"), in 1983.

About ten years later, in June of 1993, Creative Hairdressers subleased the G Street

Property to Fischer, personally.  Fischer later assigned the sublease to his corporation,

Restaurant Group, as was permitted by his agreement with Creative Hairdressers.

In 1999, Modiri inquired about renting the third floor of the G Street Property to

start a day spa.  Before entering into a sublease, Modiri and Fischer had a number of

interactions.  Fischer visited the property with Modiri, and Fischer had discussions about

the purported day spa with Modiri.  In that conversation, Fischer claims that Modiri had

told him that "[the day spa] would perform massages and the services that . . . went along

with that—that business."[7]  Fischer did not further specify what "services . . . went along

with that business."

Fischer further testified that "at the time we were discussing it, it seemed to be on

the up and up with me."[8]  Further, Fischer claims that he was concerned about the legality

---

[6]     Sub-sublease ¶ 7 (the "**Lawful Operation Clause**").  The judgment may also have been based on
a violation of a separate covenant in the Sub-sublease, ¶ 9 (the "**Use Clause**"), which provided
that "Subtenant shall use the Premises for a therapeutic massage facility."

[7]     Trial Tr. 100.

[8]     *Id.*

of Modiri's operations, and that Fischer made it clear to Modiri that he wanted no illegal activity on the premises.  Fischer noticed at the time that there is a "fine line between a massage parlor and a house of prostitution."[9]  Fischer claims that he had "inquired of [the concern about prostitution] at the time" and testified that "[Modiri] assured me that that was not his business."[10]

Prior to the signing of the lease, but after Fischer had shown Modiri the space, the parties discussed the addition of a provision to the lease which stated that the "subtenant shall use the premises for a therapeutic massage facility."  The provision, which with or without changes evolved into the Use Clause,[11] was drafted by Fischer's attorney, Stanley Goldschmidt.  Fischer and Modiri had conversations during which the parties "specified what [Modiri] was going to do there, specifically."[12]  Fischer went on to explain that this language was then conveyed to Goldschmidt so that an appropriate provision could be written in order to "satisfy the requirement of the tenant, and also to satisfy my requirement as a landlord."[13]

---

[9]     Specifically, Fisher testified to his recollection of conversations with Modiri from before the lease signing:

> I remember discussing the issue with Mr. Modiri and specifically recalling that I was concerned that what he was doing was legal, and that I did not want anything illegal in the premises to take place.  And there is that fine line between a massage parlor and a house of prostitution.  He assured me that that was not his business. Because I inquired of it at the time.

Trial Tr. 101.

[10]    Trial Tr. 101.

[11]    *See* n.6 *supra*.

[12]    Trial Tr. 98.

[13]    *Id.*

In October 1999, the Restaurant Group entered into the Sub-sublease, with Modiri and Sea K. Oh,[14] for the third floor of the G Street Property.  Modiri, Modiri's girlfriend and business partner Yi, and Fischer were at the signing.   Yi signed the lease as a witness.  Two months later, on December 10, 1999, Restaurant Group and Modiri entered into an amendment to the Sub-sublease, under which Modiri agreed to sublease the second floor as well as the third floor of the G Street Property.

Although Modiri was the subtenant of record under the sub-sublease, Yi—Modiri's girlfriend and business partner—was the primary operator of the purported massage facility at the G Street Property.  However, Modiri never formally sub-leased the property to either Yi or any entity bearing the trade names[15] she used to operate the business.

The original permits for the build-out of Modiri's subleased space in the G Street Property, in December 1999 and February 2000, referred to its use as "tanning & skin care salon."[16]  The Certificate of Occupancy, issued later in July 2000, referred to the purposes of the occupancy as "skin care & tanning services—not sexually oriented."[17] Later, in March 2001, after issues as to the use of the G Street Property came to a head, Fischer recommended to Modiri "that you get the necessary Certificate of Occupancy for a massage parlor."[18]

---

[14]   Sea K. Oh was no longer a party to the G Street Location lease effective as of the First Amendment to the Real Property Lease dated December 10, 1999.  Pl. Exh. 13A.

[15]   The premises operated under the trade names Time Out and Tan Q, Inc.

[16]   Pl. Exh. 2.

[17]   Pl. Exh. 14.

[18]   Pl. Exh. 21.

A little less than a year later, in September 2000, Tomkat, Inc. ("**Tomkat**") purchased the property from the Original Owners and assumed the Master Lease with Creative Hairdressers.  On February 7, 2001 (five or six months after its acquisition of the G Street Property), Tomkat notified Creative Hairdressers, Tomkat's prime tenant, that Creative Hairdressers was in default on the Master Lease, because Creative Hairdressers had permitted the premises to be operated as a house of prostitution in violation of local law.  The Court does not make a finding as to whether or not this was the real reason that Tomkat raised the issue.[19]  As a result, Creative Hairdressers notified Fischer's corporation of the default, and Fischer then notified Modiri.

At about the same time, the District of Columbia issued two Notices of Infractions arising from improper permits with respect to the use of the G Street Property.  On February 22, 2001, Fischer took Yi and Modiri to consult with one Barry Haberman, Esq, one of Fischer's lawyers,[20] in connection with the Notices of Infractions.[21]  By letter written that same day addressed to Tan Q (but c/o Modiri), Haberman confirmed the terms under which he would represent Tan Q with respect to the Notices of Infractions. The letter was countersigned by one Hyang Chong, on behalf of Tan Q.[22]

---

[19]    In a letter dated March 6, 2001, Fischer wrote Modiri:

> As you know the new owner of the building is trying to assemble the block and our leases stand in his way.  It is clear from my conversations with the master tenant, Creative Hairdressers that the new owners want to tear down the property.  They have asked Creative Hairdressers to vacate the property; however, they have no authority to do so without my approval.

Pl. Exh. 21.

[20]    Haberman began representing Fischer and his various corporations some time in either the late 1990s, 2000 or 2001.  Haberman Dep. at 7-8.

[21]    Modiri Aff. ¶ 17.

[22]    Pl. Exh. 12.

Thereafter, Fischer sent Modiri and others several letters during this time period. In the most important of them, sent on March 6, 2001 (which the Court finds to be plainly self-serving), Fischer wrote to Modiri:

> [y]ou have represented [*sic.*] me that you are not involved in anything that would be considered an infraction under the lease and/or illegal.  As I have stated to you, if in fact you are in breach of the lease, I will immediately terminate your lease and take possession of the premises.  I do not look upon this matter lightly.  I am a well-respected businessman and have been doing business in this city for over 25 years and would not want my name involved in any illegal activity.[23]

Fischer further stated that he had talked to "your attorney, Barry Haberman," and "I believe for the time being you are in good shape."[24]  Fischer also recommended that Modiri "get the necessary Certificate of Occupancy for a massage parlor."

Ultimately, Tomkat filed a complaint against Creative Hairdressers in the Civil Division of the DC Superior Court.  By reason of a series of indemnification obligations in the waterfall of subleases (and, presumably, because it was allegedly Modiri's subtenancy that was causing the problem), Modiri became the party responsible for defending the litigation.[25]  Modiri advised that he did not want his name appearing anywhere,[26] but Fischer knew of Modiri's role.  As Haberman needed a witness to contest the eviction proceeding, Modiri "sent a lady, I forget her name, who was a manager,

---

[23]   Pl. Exh. 21.

[24]   *Id.*

[25]   Haberman Dep. 30.

[26]   *Id.* 20, 31.

apparently, of the facility."[27]  During the trial, not just Haberman, but also Fischer, met

with her in the DC court cafeteria to interview her and prepare her to testify.[28]

Tomkat prevailed in the eviction action, which, as noted, was technically speaking

against the first level tenant, Creative Hairdressers[29] in the trial court.  Though the record

before this Court as to the matter is incomplete, the controversy apparently went up on

appeal.  In a series of aggressive letters to an individual who from the context appears to

have been Tomkat's counsel, Fischer spoke of his ability to impede Tomkat's "ability to

vacate the Property"[30] and "ability to move forward with his project,"[31] and of his ability

to tie up Tomkat in court.

Under the terms of the sublease, Modiri could be held responsible for any

Restaurant Group liability to Creative Hairdressers, if caused by actions by Modiri, the

sub-subtenant.  Accordingly, in early 2004, Restaurant Group filed suit against Modiri

and won a $494,055.35 judgment for damages sustained as a result of Modiri's default

under the Sub-sublease and related amendment.[32]

Modiri subsequently filed for bankruptcy protection in this Court and sought to

discharge his debt, including the judgment owed to Restaurant Group.  Restaurant Group

brought this action seeking a declaration by this Court that the judgment entered by the

DC Superior Court is nondischargeable under sections 523(a)(6) and 523(a)(2)(A).

---

[27]   *Id.* 31.  Whoever the witness was, it was not Yi.  *See id.* 35.

[28]   *Id.* 31-32.

[29]   Judge Linda D. Turner concluded that the sub-tenant had indeed conducted illegal activity on the premises and therefore Creative Hairdressers was responsible for damages suffered as a result. *See Tomkat, Inc. v. Creative Hairdressers*, No. LT 10689-01 (Sup. Ct. D.C., decided May 10, 2001) ("***Tomkat***").

[30]   Def. Exh. C.

[31]   Def. Exh. F.

[32]   *See* n.33 *infra*.

## 2. Development and Use of the G Street Property

Upon taking possession of the G Street Property, Modiri and Yi developed and used the property as a brothel. The premises were operated under the trade names "Time Out" and "Tan Q, Inc." By reason of earlier rulings in the District of Columbia, Modiri is collaterally estopped from denying that a brothel existed on the premises.[33] The Superior Court's findings are further buttressed by evidence provided in this trial, particularly the videotaped deposition testimony of Leon Stover, a construction worker employed by Johnny B. Quick, Inc. ("**Johnny B. Quick**"), a local construction company, discussed below.

## 3. Stover's Testimony

Prior to or contemporaneous with entering the lease with Restaurant Group at the G Street Property, Modiri contracted with Johnny B. Quick to make various repairs and aesthetic changes to another facility in Washington DC at Bladensburg Road and New York Avenue (the "**Bladensburg Property**"). First on behalf of Johnny B. Quick, and then as an individual, construction worker Stover worked on each of the Bladensburg Property and the G Street Property.

As Stover testified, the Bladensburg Property was also a brothel, at which he provided construction services to Modiri and Yi—often receiving payment in sexual favors in lieu of cash.

---

[33]      In a previous suit between Tomkat and Creative Hairdressers, the court determined that prostitution had occurred on the premises. *See Tomkat*, No. LT 106891 01 (Sup. Ct. D.C., decided May 10, 2001), *aff'd, Creative Hairdressers, Inc. v. Tomkat, Inc.*, Nos. 01-CV-798 (D.C. May 13, 2003). Restaurant Group obtained a judgment against Modiri, affirmed on appeal, in which collateral estoppel was held to be properly invoked. *See 1342 Restaurant Group, Inc. v. Farzad Michael Modiri*, No. 01-CA-005164 (Sup. Ct. D.C. filed Sept. 20, 2004) (finding that the "spa was a front for prostitution" and noting that Modiri is collaterally estopped from claiming otherwise); *See also Modiri Appellate*, 904 A.2d at 391 (upholding the lower court's collateral estoppel ruling). Modiri's counsel acknowledges that Modiri is collaterally estopped from denying that prostitution occurred on the premises. Trial Tr. 79.

Shortly after the completion of construction work at the Bladensburg location, Stover came to work on the G Street Property.  There too he completed certain repairs and other construction-related jobs in exchange for sex with employees of the "parlor." According to Stover, Modiri was present during the construction of the facilities at both the Bladensburg Property and the G Street Property, and was aware that those premises would be used as brothels.[34]

The Court finds Stover's testimony to be credible.  Unlike each of Modiri and Fischer, Stover had no financial interest in the outcome of the case.  The Court could observe Stover's testimony on tape, and he answered questions quickly and directly. Stover's testimony was detailed and to the point, and he even testified to matters that might be embarrassing (or perhaps even illegal), such as admitting to acceptance of sex in exchange for his services.

*4. Modiri's Claims*

Modiri disputes that he was aware of the prostitution occurring on the premises, despite a great deal of evidence suggesting his involvement in its operation.  Modiri was listed in official documents and tax returns as the president and 100% shareholder of Tan Q.[35]  He signed Tan Q's checks.[36]  He received compensation in the form of dividends and payments from Tan Q's payroll, as it operated its brothel.[37]  Stover's testimony places Modiri at the scene of each of the two brothel locations.  And finally, the Court remains mindful that the brothel was operated by Modiri's girlfriend Yi; it is difficult for

---

[34]    Stover Dep. 16-22.

[35]    Trial Tr. 176-180.

[36]    Pl. Exh. 15.

[37]    Trial Tr. 176-180.

the Court to believe that Modiri's girlfriend would have concealed from him what was going on there.

Modiri claimed ignorance, testifying that he lived in California during the duration of the lease and believed that Yi was running the business as a legitimate spa. He testified that he only signed the lease as a guarantor for Yi,[38] and that his name was on the certificate of incorporation as a temporary convenience that he later intended to amend, but did not.[39]  Modiri further claimed that he signed the tax returns without reading them, and that the payments from Tan Q were either reimbursements or accounting errors, and were not compensation.[40]  He asserted that Stover lied in the vast majority of his deposition.[41]  But for reasons apparent from the preceding discussion, the Court believes Stover, not Modiri.  The coincidences alleged by Modiri are too great and too many for Modiri's claims of ignorance to be credible.

### 5.  Fischer's Claims

The Court does not find Fischer's testimony to be credible either.  As a consequence of his demeanor at trial, inconsistencies in his testimony, evidence that Fischer unpersuasively attempted to explain away, inconsistencies between his various accounts and other evidence in the record, and his bias,[42] the Court finds the key elements of Fischer's testimony to be unworthy of belief.

---

[38]  *Id.* at 138-140.

[39]  *Id*. at 168-169.

[40]  *Id*. at 140-142, 169, 177-180.

[41]  *Id*. at 142-145.

[42]  Fischer had an on obvious personal interest in preserving the enforceability of the $500,000 judgment Restaurant Group secured.  He also revealed his personal animosity toward the debtor. *See* Def. Exh. D (responding to a letter request from Haberman seeking approval of a replacement subtenant and termination of Modiri's lease, "I will never let Mike out of the lease.  He has caused me much heartache.").

As a preliminary matter, the Court notes its strongly adverse impression of Fischer's trial demeanor. Fischer was not at all straightforward. Neither his eye contact nor his tone of voice inspired confidence in the accuracy of what he said, or, especially, its completeness. When questions sought detail as to what Fischer said had transpired, Fischer could not recall, or "specifically recall."[43] Fischer appeared much less than candid in the courtroom, and came across as a "wise guy." In fact, the Court cannot recall a less credible witness in over 10 years on the bench.

Fischer's claims were also unworthy of belief by reason of objective facts. Fischer was shown to be untruthful in his efforts to portray surprise in February 2001 at the presence of the operator of the massage parlor, Tan Q. In a letter to Modiri on February 15, 2001, Fischer stated:

> I have received a rental check for last month's rent from a corporation "Tan Q Inc." I'm enclosing the rental check for your review. It is clear to me that you have a [sic.] transferred to the lease to this corporation, which seems to be owned by [your alleged manager] Christine. Pursuant to the lease, any transfer of ownership has to be approved by me. Since I have not approved a lease transfer *and/or even been notified*, I can only advise you that your are in default of your sub-sublease. We need to rectify this situation and know who the actual tenant is if the spa is to stay. As you know, you have personally guaranteed the lease.[44]

But Modiri had not guaranteed the lease; he was the signatory as a principal, not guarantor. Fischer's belief that Modiri was merely a guarantor confirms that Fischer had well understood that another entity was on the lease, or at least operating there, despite Fischer's protestations to the contrary in February 2001. Fischer further confirmed his

---

[43]      *See., e.g.*, Trial Tr. 95, 97, 100.

[44]      Def. Exh. A. (underlining in original; italics added).

understanding that Tan Q was on the lease, or at least operating there, in his June 6, 2001 letter to Stacey Costello, in which Fischer also referred to one or more communications he had with Tan Q.[45]

Likewise, in his February 15, 2001 letter, Fischer professed surprise upon receiving a check from Tan Q, and exploited this as if receipt of payment from Tan Q was something new.  In fact Fischer had received and deposited an earlier check from Tan Q, in September 2000, five months earlier.

Further, the Certificate of Occupancy, issued in July 2000, nine months earlier, was issued to Tan Q.  The Certificate of Occupancy was required by law to be posted conspicuously on the premises at all times,[46] though the record is silent as to whether or not it was actually posted as the law required.  But it is clear that Modiri provided Fischer with the Certificate of Occupancy, as Fischer confirmed in his testimony on direct.  And the Court also finds that Modiri gave Fischer the Certificate of Occupancy in connection with *future* operations—as contrasted, for example, to having given it to Fischer at a much later time.  Fischer stated, in his direct testimony:

> When Mr. Modiri provided me with the Certificate of Occupancy for the leased property, I noticed that it was in the name of Tan Q, Inc.  He explained that he had formed a corporation that was *going to be* the business entity in which the business was *to be* run.[47]

---

[45]     Trial Tr. 48-49 and Def. Exh. C ("Additionally, *the former tenant*, TanQ [*sic.*], has indicated to me that they would also like to re-open in the premises and *they assured me* that they would acquire all of the necessary permits required under the law.") (emphasis added).  Of course, if Fischer had not in fact been communicating with Tan Q, then Fisher's reference to such communication once more evidences his tendencies to shade the truth.

[46]     Pl. Exh. 14 ("THIS CERTIFICATE SHALL BE POSTED CONSPICUOUSLY ON THE ABOVE PREMISES AT ALL TIMES") (block caps in original).

[47]     Fisher Aff. ¶ 13 (emphasis added in each instance).

Fischer's belief that Modiri was only a guarantor, his receipt of the Certificate of Occupancy, and his earlier deposit of Tan Q's check, all (and especially collectively) confirm his knowledge of Tan Q's occupancy all along.

Fischer's testimony was unworthy of belief in other respects as well. At trial, Fischer could not remember having seen Tan Q's Certificate of Occupancy—despite having expressly said that he had seen it in his direct testimony affidavit.[48] At trial, Fischer testified that he had heard about the prostitution at the G Street Property only from Stover, at the time of Stover's deposition—but Stover, whose testimony the Court found credible (both when it cut against Modiri and when it cut against Fischer), testified that he had told Fischer about the prostitution *a year before the deposition*.[49] And Fischer testified that it was a regular practice for landlords to receive checks from entities different from their named tenants, but then could not explain why his receipt of a check from Tan Q prompted him to accuse Modiri of assigning the lease.[50]

Other facts too, especially in combination, cause the Court to doubt Fischer's denials of notice of what was going on. According to Fischer, Modiri told him that he wanted to operate a health spa requiring his customers to walk up two flights, up to the third floor, to get to the premises.[51] But there was no discussion concerning whether the public would find that convenient or inconvenient.[52]

Despite the importance, according to Fischer, of inclusion of clauses in the Sub-sublease describing the prospective use of the property, and requiring compliance with

---

[48]     *Compare* Trial Tr. 42-44 *with* Fisher Aff. ¶ 13.

[49]     *Compare* Trial Tr. 35-37 *with* Stover Dep. 39.

[50]     *Compare* Trial Tr. 65 *with* Def. Exh. A.  *See also*, Trial Tr. 16.

[51]     Trial Tr. 97.

[52]     *Id.*

law, Fischer never inquired, between the time the Sub-sublease was signed and DC raised

its issues, 16 months later, to ascertain whether the premises were being used for a lawful

purpose.[53]

    During the time of operation of the brothel (with the exception only of the two

instances in which he received a Tan Q check), Fischer received the rent each month—

$5,800 per month—in cash.[54]  "Sometimes they were all hundreds.  Sometimes fifties and

some twenties."[55]  Fischer agreed that this would mean 58 Hundred Dollar bills, or more

if the cash handed over was in smaller bills.[56]

    In his direct testimony, Fischer evasively used the passive form—"[t]he payments

were delivered to my office . . ."—without saying that Modiri made them.  In fact, as

Fischer testified, they were transported to Fischer's office in a pocketbook,[57] by one or

more women—who, it may fairly be inferred, either were employed at the G Street

Property, or knew those who were.  Any mystery as to who paid the rent was resolved by

---

[53]     *Id.* at 103-104.  The testimony was:

> I took him for his word.  I had no reason to doubt him.  He
> seemed like he was an honorable man.  He came in and did
> everything a tenant would do.  He looked at the location.  He
> negotiated a lease.  He brought in the right amount of deposits.
> He did everything that, you know, a tenant would do. … He
> didn't—raise any suspect. [*sic.*]

[54]     *See* Fischer Aff. ¶ 16.

[55]     *Id.* at 103-104.

[56]     *Id.* at 103.  Fischer testified that this was "not something that was out of the ordinary," and that
about "fifty percent of the tenants of properties that we handled were paying cash."  *Id.* at 104.
The Court is not in a position to determine whether or not that is true.  But payments of large
amounts of cash—especially from those whose businesses may or may not be lawful—inevitably
cause concerns.  Fischer's efforts to downplay this, initially and then again on follow-up
questioning, *id.* 124-125, failed to satisfy the Court's concerns in this regard.

[57]     Trial Tr. 104-105.

Yi, in testimony the Court finds credible in this respect.  It was she who paid Fischer, and there were even times that Fischer came to the spa to collect the rent.[58]

In the one visit to the premises during the construction period that Fischer said he could remember, Fischer observed that the only signage on the property was a small sign on the front door of the G Street Property, which when entered would lead up to the second and third floor, that read "Time Out Day Spa"—despite the fact that Fischer "had a sign on the building that was a good sized sign that he [Modiri] was allowed to use."[59] The small sign had no description of the services that were being provided.[60]  Fischer did not recall seeing a sign on the third floor.[61]  The small and minimal signage—when much more extensive signage would be expected for a business with a lawful purpose—further supports an inference that Fischer knew, or closed his eyes to the fact, that lawful activity was not underway there.

Other Yi testimony is also more credible than Fischer's, when considered in the context of surrounding facts, its much greater specificity, and common sense.  In other testimony that the Court accepts, Yi testified that:

---

[58]      Yi testified:

> Almost every month, except for the few times that he [Fischer] came to the spa to collect the rent, I went to his office to pay him.  The payments were in cash as per his request.  On one occasion he drove me from his office back to the spa.

Yi Aff. ¶ 10(c).  The Court makes no finding as to the accuracy of Yi's statement, disputed by Fischer, that Fischer requested that the payments be made in cash.  It finds the remainder, which addresses matters as to which Fischer's testimony was vague, to be credible, principally by reason of its greater specificity and consistency with other established facts.

[59]      *Id.* 109.

[60]      *Id.*

[61]      *Id.* 110.

(1) Fischer called Yi when the first floor restaurant owner "complained about the location in the back of the building where our trash was placed";[62]

(2) On another occasion, Fischer called Yi "when the first floor restaurant complained about water that was being leaked into the restaurant from my steam cubicle";[63]

(3) During the construction of the third floor, Fischer repeatedly contacted Yi, "and requested that I take over the second floor as well. After I told him that I would consider [*sic.*], he came on at least two occasions, to show me the floor."[64]

For these reasons, the Court finds the great bulk of Fischer's testimony unworthy of belief.  The Court finds that at some point in time, no later than very early in Modiri's tenancy, Fischer was aware of the unlawful activity.  The Court further finds that Fischer did not rely (much less reasonably rely) on anything Modiri might have said about use of the G Street Property.  Restaurant Group's loss of its G Street Property leasehold in the litigation in the DC courts came only after—long after—Fischer  knew what the premises were being used for, and failed to take action to stop it.

*6.  Ultimate Facts*

The Court finds, as ultimate facts:

---

[62]     Yi Aff. ¶ 10(a).

[63]     *Id.* ¶ 10(b).

[64]     *Id.* ¶ 10(d).

1. Modiri knowingly allowed the G Street Property to be used for purposes of prostitution, and knowingly violated Paragraphs 7 and 9 of the Sub-sublease.

2. Modiri did not attempt to injure Restaurant Group or Fischer, willfully, maliciously or otherwise. Modiri lacked any intent to cause any injury, malicious or otherwise, to Restaurant Group or Fischer. Modiri merely wished to facilitate the prostitution that took place there, either for his own benefit or, more likely, for the benefit of his girlfriend.

3. Modiri discussed his plans for the G Street Property with Fischer. If (though the Court doubts it) Modiri actually made a representation to Fischer that the G Street Property would be used as a "spa" or massage parlor and not for prostitution, Fischer did not believe it or reasonably rely upon it.

4. To the contrary, Fischer knew what the G Street Property really was being used for within a very short time after the tenant improvements were completed. Fischer closed his eyes to the future use of the G Street Property before the Sub-sublease was signed, and closed his eyes (to the extent that he had not yet become fully aware) to the actual use of the G Street Property thereafter.

5. Fischer was on notice, before the Sub-sublease was entered into, that the G Street Property very possibly might be used for prostitution, and knew after the Sub-sublease was entered into, but before Restaurant Group's lease was lost in the DC Courts litigation, that the

G Street Property was in fact being used for prostitution.  To the extent

that Fischer did not know, before the Sub-sublease was entered into, that

the G Street Property would be used for prostitution or likely would be, he

willfully closed his eyes to that eventuality.  To the extent that Fisher did

not know, prior to the execution of the Sub-sublease that the G Street

Property would be used for prostitution, Fisher recklessly disregarded that

likelihood.

6.  Fischer did not rely on any representations that the G Street

Property would be used as a day spa or only for lawful purposes.

7.  To the extent Fischer relied on any Modiri statements as to the

future use of the premises or an intent to comply with law (which the

Court finds is not at all), any such reliance, in light of the surrounding

facts and circumstances, was neither reasonable nor justifiable.

<u>Discussion</u>

<u>I.</u>

<u>Burden of Proof</u>

The burden of proof in a Section 523(a) claim of nondischargeability requires the

creditor to prove each element of the claim by a preponderance of the evidence.[65]  This

standard applies to claims under each of sections 523(a)(6) and 523(a)(2)(A).[66]

---

[65]    *See Grogan v. Garner*, 498 U.S. 279, 290-91 (1991).

[66]    *See id.* at 291 ("[W]e hold that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard");  *In re Mitchell*, 227 B.R. 45, 50 (Bankr. S.D.N.Y. 1998) (Bernstein, C.J.) (applying standard to both categories of discharge exceptions) ("***Mitchell***").

Exceptions to discharge must be literally and strictly construed against the creditor and liberally in favor of the debtor.[67]

II.

Section 523(a)(6)
Willful and Malicious Injury

Plaintiff Restaurant Group asserts first that Modiri's breach of the lease was a "willful and malicious injury," resulting in a judgment that created a nondischargeable debt under Section 523(a)(6) of the Code. The Court disagrees. There was no showing that Modiri intended to cause any injury, much less any injury that was "willful and malicious."

Section 523(a) provides, in relevant part:

> (a) a discharge . . . does not discharge an individual debtor from any debt—
>
> . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity."[68]

By section 523(a)(6)'s plain terms, to be nondischargeable under this subsection, debt must arise from both willful and malicious conduct.

In *Kawaauhau v. Geiger*[69], the Supreme Court explained that the "willful" requirement of section 523(a)(6) means having the intent to create the resulting injury, and not just to take an act that results in such. It stated:

---

[67]   *See Mitchell*, 227 B.R. at 50; *See also Colonial Nat'l Bank, USA v. Carrier*, 181 B.R. 742, 746 (Bankr. S.D.N.Y. 1995) (Bernstein, C.J.).

[68]   11 U.S.C. § 523(a)(6).

[69]   523 U.S. 57 (1998).

> The word "willful" in (a)(6) modifies the word
> "injury," indicating that nondischargeability takes a
> deliberate or intentional *injury*, not merely a
> deliberate or intentional *act* that leads to injury. . . .
> [T]he (a)(6) formulation triggers in the lawyer's
> mind the category "intentional torts," as
> distinguished from negligent or reckless torts.
> Intentional torts generally require that the actor
> intend "the *consequences* of an act," not simply "the
> *act* itself." [70]

Thus the caselaw makes clear that for an act to be willful, one must intend to inflict the *particular harm* that created the debt, not just to commit an act that results in the harm.[71]

Surprisingly, Restaurant Group relies on an old 1986, *In re Clayburn*,[72] stating that "[w]illful conduct is that conduct which is deliberate, intentional, and voluntarily undertaken by the debtor, and which is sufficient to cause the wrongful act."[73]  But *Clayburn*, (aside from the fact that it is inconsistent with the law in this District, such as *Gabor*) no longer can be regarded as good law, since it was decided before the Supreme Court's decision in *Geiger*.  In fact, in making its determination, the *Clayburn* court adopted the definition of willfulness that was expressly rejected by the Supreme Court in *Geiger*, when the *Clayburn* court stated that "this Court does not subscribe to the distinction made by some Courts between the intent to do harm and the intent to do the act from which harm results."[74]

---

[70]     *Id.* (emphasis in original in each instance).

[71]     *See In re McDermott*, 434 B.R. 271, 283 (Bankr. N.D.N.Y. 2010) (Davis, J.); *In re Gabor*,
         2009 WL 3233907, *6 (Bankr. S.D.N.Y. Oct. 8, 2009) (Gropper, J.) ("*Gabor*") (though ultimately
         finding all debts of the debtor nondischargeable on other grounds).

[72]     67 B.R. 522 (Bankr. N.D. Ohio 1986) ("***Clayburn***").

[73]     *Id.* at 525.

[74]     *Id*. at 526.

Whatever Modiri's purposes may have been in operating a brothel in violation of his lease, this Court found as a fact that he did not do so in an effort to cause any injury (willfully, maliciously, or otherwise) to Restaurant Group or Fischer.[75]  This was not a case of meeting a burden.  Restaurant Group offered no evidence whatever to support the notion that Modiri intended to hurt it.  Judgment must be, and is, granted in Modiri's favor on Restaurant Group's section 523(a)(6) claim.

<u>III.</u>

Section 523(a)(2)(A):
<u>(False pretenses, false representation, or actual fraud")</u>

Restaurant Group then argues, in the alternative, that its judgment claim is nondischargeable under section 523(a)(2)(A) of the Code, contending that the debt was for money or property obtained by false pretenses, a false representation, or actual fraud. Once more, the Court disagrees.  The debt in question arose as a matter of contract, and not fraud,[76] and there were no "false pretenses, false representation, or actual fraud," as those words have taken their meaning in federal bankruptcy law.

Section 523(a) provides, in relevant part:

> (a) a discharge . . . does not discharge an individual debtor from any debt—
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>>
>>> (A) false pretenses, a false representation, or actual fraud . . ."[77]

---

[75]     *See* page 18 *supra.*

[76]     *See Modiri-Appellate*, 904 A.2d at 393.

[77]     11 U.S.C. § 523(a)(2)(a).

As usual,[78] the Court starts with textual analysis.  Subsection (a) provides for an exception to discharge "from any debt" that meets the requirements of one of the subsections that follows it.  The "debt" for which Restaurant Group seeks an exception is the judgment debt Restaurant Group secured in the DC courts.  The judgment was based on breach of contract, as noted in *Modiri-Appellate*, and as this Court found[79]—not on fraud.  So unless there is some basis for recharacterizing it, or looking to its substance beyond its form, section 523(a)(2)(A) has not been satisfied.

While the Court assumes that consideration of the substance of the claim might sometimes be appropriate, there is no basis for any different conclusion based on substance here.  Restaurant Group secured its judgment based on the violation of a contractual covenant as to which Modiri's scienter was irrelevant.  Paragraph 9 of the Sub-sublease simply required Modiri's compliance with law.  Modiri allowed the G Street Property to be used in violation of law, and for that the DC courts entered a judgment against him for the resulting damages.  But violation of Paragraph 9 was sufficient to support the DC judgment without any evidence whatever of Modiri's intent in entering into the Sub-sublease or operating the premises.  And that is all that the DC courts needed to, and did, find.

Of course, Restaurant Group bases its complaint here on a second contention as well—that Modiri defrauded it when Modiri expressed the alleged intention to use the G Street Property as a spa and not in violation of law.  But here too the Court cannot find that the requirements of section 523(a)(2)(A) were met.

---

[78]     *See, e.g., In re General Motors Corp.,* 407 B.R. 463, 486 (Bankr. S.D.N.Y. 2009), *appeal dismissed and aff'd,* 428 B.R. 43 (S.D.N.Y. 2010) and 430 B.R. 65 (S.D.N.Y. 2010).

[79]     *See* n.5 *supra.*

First, of course, the above quoted "debt" requirement has not been satisfied, because the DC courts did not base their judgment on this basis either.  And looking behind that, to realities, Restaurant Group suffered the losses that formed the bases for its judgment on defaults on its sublease arising from activities on the G Street Property of which Fischer was aware by the time Tomkat brought its action.  Fischer had many months to stop the illegal activity before Tomkat secured its judgment, but failed to do so.  Even if Modiri had intended to, and did, defraud Fischer and/or Restaurant Group with respect to the future use of the G Street Property, there would have been no loss to Restaurant Group if it had timely acted when it became aware of everything that was going on.

Going even further behind that, to other realities (assuming, *arguendo*, that such is required), the requirements of section 523(a)(2)(A) still were not satisfied.  The judgment was not for fraud, but considering (without here deciding that such is appropriate) whether a judgment *could* have been entered in Restaurant Group's favor for fraud (or false pretenses or false representations), here the Court cannot reach such a conclusion.

In analyzing that issue, the Court first assumes, without deciding, that although all of the rent was paid, Modiri's having secured the benefit of the leasehold while having failed to meet a nonmonetary obligation on the lease would be sufficient to have met subsection (2)'s requirement that "property" was obtained by fraud.[80]  But even so, given

---

[80]    That is not entirely clear, but if, as the Court also assumes, a leasehold brings with it a bundle of rights, coupled with a bundle of obligations, either side's denying the entire bargained-for exchange to the other could amount to the requisite transfer of "property."  *Cf. In re Brewer*, 66 B.R. 214, 217 (Bankr. S.D.N.Y. 1986) (Schwartzberg, J.) (for the purposes of 523(a)(2)(A), a lease is "a credit transaction to the extent that the lessee is obligated to pay for the right of possession which is transferred in exchange for the lessee's obligation to pay rent).  Of course, any

the Court's factual findings, described above, Restaurant Group has failed to satisfy the requirements under the caselaw for nondischargability for "false pretenses, a false representation, or actual fraud" as used in section 523(a)(2)(A).

Chief Judge Bernstein has explained that "[a] party proceeding under this subsection must establish five elements:  (1) a representation, (2) falsity, (3) scienter, (4) justifiable reliance and (5) damage."[81]  Here at least[82] the fourth and fifth requirements under that standard are not satisfied.

The fourth requirement, that of justifiable reliance, is the most obvious element that here is lacking.  In *Field v. Mans*[83] the Supreme Court discussed the form of reliance required in context of 523(a)(2)(A).  It held that a creditor's reliance must be justifiable. A party alleging fraud "is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation."[84]  A showing of justifiable reliance "is a matter of the qualities and characteristics of the particular

---

[81]   *Mitchell*, 227 B.R. at 50 (citing *Fellows, Read & Assocs. v. Rieder*, 194 B.R. 734, 737 (S.D.N.Y. 1996), *aff'd without opinion*, 116 F.3d 465 (2d Cir. 1997)).  Many other cases, in this District alone, have held similarly.  *See In re Vanarthos*, — B.R. —, 2011 WL 782044, *5 (Bankr. S.D.N.Y. Mar 7, 2011) (Glenn, J.); *In re Vanarthos*, 440 B.R. 67, 73 (Bankr. S.D.N.Y. 2010) (Glenn, J.)  *DeRosa v. Jacone (In re Jacone)*, 156 B.R. 740, 743-744 (Bankr. S.D.N.Y. 1993) (Schwartzberg, J.).

[82]   As noted above, *see* page 18 *supra*, the Court doubts that Modiri actually made the representation to Fischer that the G Street Property would be used as a massage parlor and not for prostitution, but for the sake of argument assumes that he did.  Likewise, the evidence of scienter—intent on Modiri's part to deceive—was very thin, to the extent it was there at all, amounting to little more than a showing of Modiri's motivation to secure the leasehold.  But once more, for the sake of argument, the Court assumes that the scienter showing was sufficient.  Of course, each of these matters becomes moot in light of Restaurant Group's failure to satisfy the requirements of justifiable reliance and resulting damage.

[83]   516 U.S. 59, 70-72 (1995).

[84]   *Id.* 70.

plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."[85]   And, of course, even before the reliance can be said to be justifiable, reliance in the first place must be shown.

As noted above in the Court's Findings of Fact,[86] the Court has found, among its ultimate facts, that for reasons previously discussed at length, Fischer was on notice, before the Sub-sublease was entered into, that the G Street Property very possibly might be used for prostitution, and knew after the Sub-sublease was entered into, but before Restaurant Group's lease was lost in the DC courts litigation, that the G Street Property was in fact being used for prostitution.  To the extent that Fischer did not know, before the Sub-sublease was entered into, that the G Street Property would be used for prostitution or likely would be, he willfully closed his eyes to that eventuality.

Thus this Court has found that Fischer did not rely on any representations that the G Street Property would be used as a day spa or only for lawful purposes.  The Court similarly has found that to the extent Fischer relied on any Modiri statements as to the future use of the premises or an intent to comply with law (which the Court has concluded was not at all), any such reliance, in light of the surrounding facts and circumstances, was neither reasonable nor justifiable.[87]  Knowing as much as he did— and willfully closing his eyes to what he saw—Fischer cannot show any reliance on anything Modiri said, much less reasonable or justifiable reliance.

Fifth and finally, the Court agrees that Restaurant Group suffered damages, or at least was injured.  The problem is that the injury and alleged damages ultimately cannot

---

[85]     *Id.* 71.

[86]     *See* page 18 *supra.*

[87]     *See* page 19 *supra.*

be said to have flowed from what, if anything, Modiri said.  Assuming, *arguendo*, that

Modiri made the representations Fischer claims, Fischer learned the truth very shortly

thereafter, and long before Restaurant Group lost the leasehold.  If Fischer cared about

the violations of law the future absence of which he claims were represented to him, he

could have, and should have, taken action long before Tomkat commenced the legal

proceedings it did.  If he had done so, Restaurant Group would have not suffered the

losses upon which its judgment was based.

Since Restaurant Group must prove by a preponderance of the evidence that all

five prongs are met in order to qualify for an exemption from discharge under section

523(a)(2)(A), Restaurant Group has failed to meet its burden.

## Conclusion

For the foregoing reasons, judgment will be entered in favor of defendant Modiri

on each claim.

Pursuant to Fed. R. Civ. P. 58 (made applicable to this adversary proceeding by

Fed. R. Bankr. P. 7058), the Debtor is to settle a standalone judgment in accordance with

this Decision.  The time to appeal will run from the time of entry of judgment, and not

from the date of this Decision.

Dated: New York, New York
   April **_18th_**, 2011

          **_s/Robert E. Gerber_**
          United States Bankruptcy Judge